Certiorari granted, June 28, 2010
Reversed by Supreme Court, June 13, 2011

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: MUTUAL FUNDS INVESTMENT
LITIGATION.

---

FIRST DERIVATIVE TRADERS, on
behalf of itself and all others
similarly situated,

*Plaintiff-Appellant,*

and

CRAIG WIGGINS, individually and
on behalf of all others similarly
situated,

*Plaintiff,*

v.

JANUS CAPITAL GROUP,
INCORPORATED, f/k/a Stilwell
Securities Laws Financial,
Incorporated; JANUS CAPITAL
MANAGEMENT,

*Defendants-Appellees,*

and

MARK B. WHISTON; LOREN M.
STARR; GREGORY A. FROST,

*Defendants.*

No. 07-1607

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:04-cv-00818-JFM; 1:04-md-15863-JFM)

Argued: October 31, 2008

Decided: May 7, 2009

Before MICHAEL, SHEDD, and DUNCAN, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Michael
wrote the opinion, in which Judge Duncan concurred. Judge
Shedd wrote a separate concurring opinion.

---

## COUNSEL

**ARGUED:** Ira M. Press, KIRBY MCINERNEY, L.L.P., New
York, New York, for Appellant. Mark Andrew Perry, GIB-
SON, DUNN & CRUTCHER, L.L.P., Washington, D.C., for
Appellees. **ON BRIEF:** Amanda M. Rose, GIBSON, DUNN
& CRUTCHER, L.L.P., Washington, D.C., for Appellees.

---

## OPINION

MICHAEL, Circuit Judge:

Plaintiff First Derivative Traders (First Derivative) appeals
the Rule 12(b)(6) dismissal of its putative class action com-
plaint, which alleges violations of § 10(b) and § 20(a) of the
Securities Exchange Act of 1934 (Act) and Securities and
Exchange Commission (SEC) Rule 10b-5. First Derivative,
individually and on behalf of certain shareholders of Janus

Capital Group Inc. (JCG), filed the operative complaint against JCG and its wholly-owned subsidiary Janus Capital Management LLC (JCM). JCM is the investment advisor to the Janus mutual funds. The complaint alleges that JCG and JCM were responsible for certain misleading statements appearing in prospectuses for a number of the individual Janus funds during the class period. These statements represented that the funds' managers did not permit, and took active measures to prevent, "market timing" of the funds. First Derivative contends that class members (plaintiffs) bought JCG shares at inflated prices and thereafter lost money when market timing practices authorized by JCG and JCM became known to the public.

The district court concluded that plaintiffs had failed to sufficiently plead certain elements of a § 10(b) securities fraud action against either JCG or JCM. Additionally, the district court determined that plaintiffs' claim of control person liability against JCG under § 20(a) failed because plaintiffs had not pled a viable § 10(b) securities fraud claim against JCM. After reviewing the allegations on our own, we reach a different conclusion. We hold that plaintiffs' § 10(b) primary liability claim against JCM and plaintiffs' § 20(a) control person liability claim against JCG are sufficiently pled to overcome defendants' motion to dismiss. Accordingly, we reverse the district court's order granting defendants' motion to dismiss and remand the case for further proceedings.

I.

Plaintiffs seek to hold JCG and JCM liable for fraud under § 10(b) of the Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. In addition, plaintiffs allege that JCG is liable under § 20(a) of the Act, 15 U.S.C. § 78t(a), as a control person of JCM.

The original complaint was filed against JCG in U.S. District Court in Colorado in November 2003 by Craig Wiggins,

a purchaser of JCG common stock. On March 26, 2004, the Judicial Panel on Multidistrict Litigation transferred the Wiggins action from the District of Colorado to the District of Maryland for coordination with other actions involving allegations of market timing in the mutual funds industry. After the district court appointed a lead plaintiff (First Derivative) and lead counsel, First Derivative filed an amended complaint in September 2004, which, among other things, added JCM as a defendant. Defendants filed a motion to dismiss this amended complaint in February 2005, and the district court granted dismissal on the narrow ground that plaintiffs' class definition failed to satisfy the loss causation standard articulated in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

First Derivative then filed a second amended complaint (the complaint). The basic facts as alleged by the plaintiffs in the complaint are as follows. Defendant JCG is an asset management firm that, directly or through subsidiaries, sponsors and markets mutual funds and provides investment advisory and administrative services to the funds. Defendant JCM, a wholly-owned subsidiary of JCG, is JCG's primary operating company and there is overlap in the executive officers of the two companies. The greater part of JCG's revenue is generated by JCM. JCM serves as the investment advisor and administrator to the Janus funds. As investment advisor to the various Janus funds, JCM "is responsible for the day-to-day management of [the] investment portfolio and other business affairs of the funds." J.A. 206-07. "[A]s a practical matter" JCM runs the Janus family of funds. J.A. 212. First Derivative sues on behalf of persons who bought shares of common stock in JCG between July 21, 2000, and September 2, 2003, and still held shares on September 3, 2003, when their price dropped, allegedly as a result of the public disclosure of defendants' misconduct with respect to market timing.

Shares in the Janus funds were offered for sale by prospectuses that JCG and JCM "caused . . . to be issued" and "made

. . . available to the investing public." J.A. 203. The prospectuses were made available to potential investors on a joint Janus funds-JCG-JCM website, www.janus.com. The prospectuses for a number of the individual Janus funds stated that the funds had policies of discouraging market timing and that the funds engaged in measures to deter such behavior.

Market timing, as it occurred here, refers to the practice of rapidly trading in and out of a mutual fund to take advantage of inefficiencies in the way the fund values its shares. Some funds, including the Janus funds, use stale prices to calculate the value of the securities held in the fund's portfolio (net asset values (NAVs)), which may not reflect the fair value of the securities as of the time the NAV is calculated. The use of stale prices to calculate the NAV makes a fund vulnerable to time zone arbitrage and other similar strategies; repeated use of such strategies is referred to as "timing" the fund. Time zone arbitrage can occur when a fund is invested in foreign securities. As we explained in *In re Mutual Funds Investment Litig.*:

> [T]ime zone differences allow market timers to purchase shares of [mutual] funds [that invest in foreign securities] based on events occurring after foreign market closing prices are established, but before the fund's NAV calculation. Prior to the daily NAV calculation, which in the United States generally occurs at or near the closing time of the major U.S. securities markets, the fund price would not take into account any changes that have affected the value of the foreign security. Therefore, if the foreign security had increased in value, the NAV for the mutual fund would be artificially low. After purchasing the shares at the low price, the market timer would redeem the fund's shares the next day when the fund's share price would reflect the increased prices in foreign markets, for a quick profit at the expense of the long-term fund shareholders.

529 F.3d 207, 211 (4th Cir. 2008) (internal citations and quotations omitted). Market timing has the potential to harm other fund investors by diluting the value of shares, increasing transaction costs, reducing investment opportunities for the fund, and producing negative tax consequences.

Plaintiffs charge that statements about market timing appearing in the various Janus fund prospectuses were misleading because they falsely represented that the Janus funds had policies of preventing market timing when, in fact, fund managers explicitly permitted significant market timing and late trading to occur.

Specifically, plaintiffs allege in their complaint that Janus fund prospectuses filed with the SEC and available at the Janus website "included language that said Janus' funds were 'not intended for market timing or excessive trading' and said 'Janus had measures in place to stop th[is] trading.'" J.A. 212-13. The complaint also cites numerous passages from prospectuses for individual Janus funds condemning the practice of market timing and outlining steps that would be taken to exclude market timers or excessive traders from the funds. For example, the complaint quotes the "Excessive Trading Policy" as set forth in the February 28, 2003, prospectus for the Janus Mercury Fund:

> Frequent trades in your account or accounts controlled by you can disrupt portfolio investment strategies and increase Fund expenses for all Fund shareholders. The fund is not intended for market timing or excessive trading. To deter these activities, the Fund or its agent may temporarily or permanently suspend or terminate exchange privileges of any investor who makes more than four exchanges out of the Fund in a calendar year and bar future purchases into the Fund by such investor. In addition, the Fund or its agent also may reject any purchase orders (including exchange purchases) by any inves-

> tor or group of investors indefinitely for any reason, including, in particular, purchase orders that they believe are attributable to market timers or are otherwise excessive or potentially disruptive to the Fund.
>
> Orders placed by an investor in violation of the exchange limits or the excessive trading policies or by investors that the Fund believes are market timers may be revoked or cancelled by the Fund . . . .

J.A. 213. The complaint repeats this language as it appeared in an earlier Janus Mercury Fund prospectus filed on Form N-1A with the SEC on February 25, 2002, and notes that "[p]rospectuses for the Janus Enterprise Fund, Janus Mercury Fund, Janus High-Yield Fund, Janus Worldwide Fund, and Janus Overseas Fund contain the exact same language in their prospectuses filed on Form N-1A with the Securities and Exchange Commission on February 25, 2002." J.A. 217. The complaint also identifies similar language in the prospectus for the Janus Advisor Worldwide Fund and the Janus International Growth Fund filed on Form N-1A with the SEC on September 30, 2001, and identifies additional allegedly misleading language in several fund prospectuses.

The complaint alleges that the statements in the prospectuses regarding market timing were misleading because JCG and JCM have subsequently admitted that they "had, for years, entered into secret arrangements to allow several hedge funds to engage in market timing transactions in various Janus Funds." J.A. 213. Drawing on a complaint filed on September 3, 2003, by the New York Attorney General in a separate action, plaintiffs allege that in 2002 JCG "granted permission for" the Canary Partners hedge fund to market time the Janus Mercury and Janus High Yield Funds. J.A. 230. Thereafter, in 2003 Canary Partners "sought [market] timing capacity in Janus' offshore funds." J.A. 231. In response to Canary Partners' request for additional timing capacity, "a concerned

[JCG] employee" sent the following email message to Richard Garland, the CEO of Janus International Growth Fund:

> I'm getting more concerned w/ all of these market timers and how they are affecting our PM's [i.e., Portfolio Managers] trading activity. [Portfolio Managers] have voiced their sensitivity on a number of occasions re: this type of activity in JWF[1]. I spoke to [a Janus employee] and confirmed that this is a big problem domestically and I want to avoid this at all cost before it gets too problematic offshore. Now that we have our exchange limitation in our prospectus, I would feel more comfortable not accepting this type of business because its too difficult to monitor/enforce & it is very disruptive to the PM's & operation of the funds. Obviously, your call from the sales side.

J.A. 231 (quoting New York Attorney General's complaint) (alterations in First Derivative's complaint). Eventually, as described in plaintiffs' complaint:

> • Managing the extensive timing activity in its funds became difficult for Janus. In early June, 2003, it began to consider adopting a consistent policy on market timing. Discussion concerning development of such a policy was opened up to certain Janus employees. Comments included:
>
> • "Our stated policy is that we do not tolerate timers. As such, we won't actively seek timers, but when pressed and when we believe allowing a limited/controlled amount of timing activity will be in JCG's best interests (increased profitability to the firm) we will make exceptions under these paramaters [sic]."

---

[1]Janus Worldwide Fund.

- "My own personal recommendation is not to allow timing, period, and follow the prospectus. . . . [T]imers often hide multiple accounts and move on the same day which could hurt other investors and enrage the Pms. . . . I don't think the static assets that we might be able to hold onto are worth the potential headaches, nor does this fall into our 'narrow and deep' focus. I suggest we maintain the timing agreements we have, but allow no more."

J.A. 232 (quoting New York Attorney General's complaint) (internal citations removed; alterations in First Derivative's complaint). JCG later admitted to the facts alleged in the Attorney General's complaint and to market timing arrangements with at least ten investors.

Plaintiffs assert that the misleading statements in the Janus funds' prospectuses stating the funds' policy of deterring market timing fraudulently induced investors to buy shares in the Janus funds. As a result of these investments, the assets in the Janus funds, and JCM's management fees, increased. JCM's management of the assets in the Janus funds generated more than ninety percent of JCG's revenue. Consequently, in September 2003 when the New York Attorney General's complaint made public the actions taken by JCG and JCM's executives to permit substantial market timing contrary to the Janus funds' expressed policies, massive withdrawals or redemptions from the funds were triggered. The assets under management by JCM decreased by $14 billion between September 2003 and February 2004. "Relatedly and predictably," according to the complaint, the Attorney General's accusations caused "a crisis of confidence among [JCG] common stock investors," resulting in a twenty-three percent decrease in the value of JCG common stock. J.A. 204-05.

The district court reviewed the complaint and granted defendants' motion to dismiss pursuant to Rule 12(b)(6). The court held that plaintiffs failed to state a claim against JCG

under § 10(b) of the Act because the complaint "contains no allegations that JCG actually made or prepared the prospectuses, let alone that any statements contained therein were directly attributable to it," and there can be no aiding and abetting liability in private securities fraud actions. J.A. 612-13 (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)). The district court further held that JCG's alleged dissemination of the prospectuses did not rise to the level of making a misstatement for securities fraud purposes. The district court determined that plaintiffs failed to state a claim against JCM because § 10(b) requires a plaintiff to demonstrate that the alleged fraud occurred in connection with the purchase or sale of a security, and since the district court had previously held that a mutual fund investment adviser owes no duty to its parent's shareholders, there was no nexus between plaintiffs as JCG shareholders and JCM. The court ruled, finally, that plaintiffs' claim of control person liability against JCG pursuant to § 20(a) of the Act must be dismissed because plaintiffs had failed to plead a viable § 10(b) claim against JCM. Plaintiffs appeal.

## II.

The central question before us is whether plaintiffs have successfully met the pleading requirements for a § 10(b) or Rule 10b-5 securities fraud claim. We review *de novo* the district court's dismissal for failure to state a claim. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 170 (4th Cir. 2007). And "[w]e must accept as true all well-pleaded allegations and view the complaint in the light most favorable to" the plaintiffs. *Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005).

Pursuant to § 10(b) of the Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate

commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (2006).

Rule 10b-5 makes it unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2008). Rule 10b-5, of course, "encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, __ U.S. __, 128 S. Ct. 761, 768 (2008).

The Supreme Court has clarified that a plaintiff suing in a typical private action under § 10(b) must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresenta-

tion or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission). *Id.* Defendants challenge the sufficiency of plaintiffs' complaint for elements (4) and (6): reliance and loss causation.

Prior to the enactment of the Private Securities Litigation Reform Act (PSLRA) of 1995, Pub.L. No. 104-67, 109 Stat. 737, § 10(b) fraud claims in this circuit "were governed by Federal Rule of Civil Procedure 9(b), not Rule 8." *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009). The PSLRA, however, has modified the pleading requirements applicable to private securities fraud actions "(1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers'*, 477 F.3d at 172. Because "Congress only addressed misrepresentations and scienter in § 78u-4(b) [of the PSLRA]," the other elements of a securities fraud claim are analyzed under the pleading standards of the Federal Rules of Civil Procedure. *Id.* Consequently, the PSLRA's heightened pleading requirements do not govern our analysis of the elements of reliance or loss causation.

Rather, we must look to traditional pleading requirements for fraud claims. At the time of the filing of the complaint in this action, Rule 9(b) provided that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[2] Rule 9(b) requires that

---

[2] After the complaint in this case was filed, the text of Rule 9(b) was changed to make it "more easily understood and to make style and terminology consistent throughout the rules." Fed. R. Civ. P. 9 advisory committee's notes (2007 Amendment). The advisory committee note makes clear that "[t]hese changes are intended to be stylistic only." *Id.*

plaintiffs plead "with particularity . . . 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed. 1990)). For the element of loss causation, we have specifically explained that

> a plaintiff purporting to allege a securities fraud claim must not only prove loss causation—that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages—but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists.

*Teachers'*, 477 F.3d at 186. Consequently, for loss causation, we review plaintiffs' complaint for sufficient specificity.

## A.

We turn first to the adequacy of plaintiffs' allegations of the element of reliance.

To state a private § 10(b) securities fraud claim, a plaintiff must allege that it relied on the defendant's false or misleading statement in purchasing or selling the defendant's securities. Reliance may be proven directly or, under certain circumstances, a plaintiff may seek the benefit of a rebuttable presumption of reliance. The Supreme Court has determined that a rebuttable presumption of reliance may apply in two distinct situations. First, when "there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge*, 128 S. Ct. at 769 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)). Second, "under the fraud-on-the-market doctrine, reliance is

presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Stoneridge*, 128 S. Ct. at 769 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

Plaintiffs in their complaint allege that the fraud-on-the-market presumption is applicable to their claims. As our court has outlined:

> To gain the benefit of the presumption [of fraud-on-the-market], a plaintiff must prove (1) that the defendant made the public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; and (4) that the plaintiff purchased the shares after the misrepresentations but before the truth was revealed.

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 364 (4th Cir. 2004) (internal quotations removed). JCG and JCM dispute only the first of these elements: that is, whether plaintiffs sufficiently alleged that defendants made the public misrepresentations. JCG and JCM press two distinct aspects of this pleading requirement, arguing that plaintiffs do not adequately allege either (1) that defendants made the statements in the prospectuses or (2) that the statements contained in the prospectuses were sufficiently publicly attributable to defendants to hold them responsible.

1.

We begin by considering whether plaintiffs have pled that JCG and JCM made the allegedly misleading statements about market timing that appeared in the prospectuses for the various Janus funds.

Defendants are correct that a § 10(b) securities fraud claim requires "a material misrepresentation or omission *by* the

defendant." *Stoneridge*, 128 S. Ct. at 768 (emphasis added). Under Rule 9(b) a plaintiff must plead with particularity "the identity of the person making the misrepresentation." *Harrison*, 176 F.3d at 784. In this case, although the individual fund prospectuses are unattributed on their face, the clear essence of plaintiffs' complaint is that JCG and JCM helped draft the misleading prospectuses. Specifically, the complaint alleges that defendants "wrote and represented [their] policy against market timers," J.A. 211, and "publicly issued false and misleading statements," J.A. 240. The complaint also alleges that defendants "represented that [their] mutual funds were designed to be long-term investments for 'buy and hold' investors and were therefore favored investment vehicles for retirement plans." J.A. 202. According to the complaint, defendants made these representations by "caus[ing] mutual fund prospectuses to be issued for Janus mutual funds and ma[king] them available to the investing public," J.A. 203, through filings with the SEC and dissemination on a joint Janus website. These statements, taken together, allege that JCG and JCM, by participating in the writing and dissemination of the prospectuses, *made* the misleading statements contained in the documents. *Cf. In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 334 (S.D.N.Y. 2004) ("Allegations that [auditor Arthur] Andersen 'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing false statements issued by Global Crossing place its involvement well beyond the realm of 'aiding and abetting' liability precluded by *Central Bank*."). And the allegations are sufficiently clear as to the identity of the entities making the misleading statements to meet the pleading standards of Rule 9(b).

2.

Our conclusion that the complaint alleges that defendants made the statements in question by participating in the preparation of the prospectuses does not end our reliance inquiry. To satisfy the fraud-on-the-market theory, the defendant must

make a "public misrepresentation." *Basic*, 485 U.S. at 248 n.27. In other words, the defendant must make a misrepresentation that is public and is attributable to the defendant. This requirement is necessary to ensure that the misleading information "is reflected in the market price of the security." *See Stoneridge*, 128 S. Ct. at 769. Here, the allegedly misleading statements about market timing appearing in the Janus funds prospectuses are unquestionably public. The real question is whether these statements were sufficiently attributable to JCG and JCM. While the prospectuses did not explicitly name JCG and JCM as the drafters, plaintiffs nevertheless allege in their complaint that JCG and JCM may be held responsible for the statements in the prospectuses because "as a practical matter [JCM] runs" the Janus funds, J.A. 212, defendants disseminated the prospectuses on a joint Janus website and, consequently, the public would attribute the misstatements in the prospectuses to defendants.

The courts of appeal have diverged over the degree of attribution required to plead reliance. Disagreement regarding the requirement of attribution extends beyond the context of fraud-on-the-market reliance and traces its origins to the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). In *Central Bank* the Court concluded that there was no separate aiding and abetting liability in private securities actions. A defendant cannot be liable absent a "showing that the plaintiff relied upon the [defendant's] statements or actions." *Id.* at 180. The Court also made clear, however, that:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-

> 5, assuming *all* of the requirements for primary lia-
> bility under Rule 10b-5 are met.

*Id.* at 191 (emphasis in original).

Several courts have interpreted *Central Bank* to suggest that reliance under § 10(b), even outside the context of fraud-on-the-market, requires direct attribution of the allegedly misleading statement to the defendant.

In *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998), the Second Circuit concluded that "a secondary actor cannot incur primary liability under the [Securities Exchange] Act for a statement not attributed to that actor at the time of its dissemination." *Wright* involved a claim by shareholders in BT Office Products Inc. (BT) against Ernst & Young, an outside auditor for BT. The shareholders' claim centered on a statement of financial results in a BT press release setting forth the company's financial results and indicating strong growth. The BT shareholders claimed that Ernst & Young was responsible for the financial report despite the fact that the press release specifically stated that the figures were unaudited. Because Ernst & Young had approved the financial information contained in the press release, the shareholders contended that the market understood that the press release was an implied statement by Ernst & Young that the financial information in the press release was accurate. The court concluded that the shareholders had failed to adequately plead reliance. Quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997), the court reasoned that

> "[i]f *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under § 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial the aid may be, it is not enough to trigger liability under Section 10(b)."

*Wright*, 152 F.3d at 175. Thus, "a defendant must know or should know that his representation would be communicated to investors." *Id.* (internal quotations removed).

*Wright* did not make clear, however, whether the statement itself must be attributed on its face to the defendant or whether a statement that the investing public would infer was drafted or approved by the defendant would qualify. The Southern District of New York's more recent decision in *Global Crossing* (discussed below) suggests that the latter may be sufficient to satisfy the attribution requirement.

The Eleventh Circuit has also adopted *Wright*'s public attribution language. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001). "Following the Second Circuit," the court "conclude[d] that, in light of *Central Bank*, in order for the defendant to be primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made." *Id.* at 1205. The Eleventh Circuit explicitly rejected the argument that "primary liability should attach to those who were never identified to investors as having played a role in the misrepresentations." *Id.* at 1206. And the First Circuit in dicta in an SEC enforcement action noted that "public attribution, like direct reliance, is necessary in a private [securities] action." *S.E.C. v. Tambone*, 550 F.3d 106, 139 (1st Cir. 2008).

The Ninth Circuit, in contrast, has concluded that public attribution is not required to plead reliance; substantial participation or intricate involvement in preparing the misleading statement is sufficient to state a primary violation of § 10(b). *See In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).

Finally, the Tenth Circuit has staked out what it perceives to be a middle ground. *See Anixter v. Home-Stake Prod. Co.*,

77 F.3d 1215 (10th Cir. 1996); *see also S.E.C. v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008). In *Anixter* the court considered the potential primary liability of an outside auditor for his alleged participation in preparing and filing registration statements, program books, and prospectuses, and his certifications and opinion letters verifying a company's overall financial health. The court explained that "[t]he critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff." 77 F.3d at 1225. The court concluded that "[a]n accountant's false and misleading representations in connection with the purchase or sale of any security, if made with the proper state of mind and if relied upon by those purchasing or selling a security, can constitute a primary violation." *Id.* at 1226.

> [F]or an accountant's misrepresentation to be actionable as a primary violation, there must be a showing that he knew or should have known that his representation would be communicated to investors because § 10(b) and Rule 10b-5 focus on fraud made in connection with the sale or purchase of a security.

*Id.* (internal quotations omitted). That is, "in order for accountants to 'use or employ' a 'deception' actionable under the antifraud law, they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors." *Id.*

Our court has declined to adopt either the direct attribution or substantial participation standard for pleading reliance. *See Gariety*, 368 F.3d at 369-70. Because the question in this case arises in the limited context of fraud-on-the-market, it is not necessary for us to establish an attribution standard for all reliance inquiries. As the Supreme Court has explained, "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a com-

pany's stock is determined by the available material information regarding the company and its business," and "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42 (internal quotations omitted). Consequently, for the public attribution element of the reliance inquiry, we hold that a plaintiff seeking to rely on the fraud-on-the-market presumption must ultimately prove that interested investors (and therefore the market at large) would attribute the allegedly misleading statement to the defendant. *See Global Crossing*, 322 F.Supp.2d at 334. At the complaint stage a plaintiff can plead fraud-on-the-market reliance by alleging facts from which a court could plausibly infer that interested investors would have known that the defendant was responsible for the statement at the time it was made, even if the statement on its face is not directly attributed to the defendant. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (clarifying pleading standards in context of 12(b)(6) dismissal). Direct attribution of a public statement, while undoubtedly sufficient to establish fraud-on-the-market reliance, is an inexact proxy for determining whether investors will attribute a publicly available statement to a particular person or entity. We conclude that the attribution determination is properly made on a case-by-case basis by considering whether interested investors would attribute to the defendant a substantial role in preparing or approving the allegedly misleading statement.

Here we must determine whether, based on JCM's duties as investment advisor to the Janus funds, JCG's role as an asset management firm and parent of JCM, and the two defendants' active dissemination of the Janus fund prospectuses, interested investors would have inferred that either or both defendants played a substantial role in drafting or approving the allegedly misleading prospectuses.

A number of courts, even in circuits that have adopted a direct attribution requirement, have concluded that in certain

circumstances auditors and corporate officers may be responsible for statements issued by the corporation or analysts that were not directly attributed to the auditors or officers. For example, in *Global Crossing* the Southern District of New York determined that Arthur Andersen, an auditor whose role was "well-known to investors" in Global Crossing, could be liable for statements made by Global Crossing that Andersen reviewed and approved but were not publicly attributed to it. 322 F.Supp.2d at 331. There, Andersen's audit reports

> were included in all of [Global Crossing (GC)]'s registration statements and annual reports from 1998 to 2000, and . . . were widely available to shareholders during the class period. Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it.

*Id.* at 334. The district court further observed that:

> Andersen's aggressive marketing of the novel accounting strategies promoted in [a paper authored by Andersen], which allegedly "became a 'must read' in the telecom industry" . . . raises an inference that sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements. These allegations are sufficient to raise a reasonable inference not only that Andersen was one of the "makers" of the statements, but also that investors viewed it as such.

*Id.*

The District of Massachusetts reached a similar conclusion in *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152 (D. Mass. 2002). There, the court pointed out that:

> While [auditor] KPMG U.S. did not sign any of KPMG's allegedly fraudulent audit reports or [Lernout & Hauspie]'s financial statements, Plaintiffs allege that it played a significant role in drafting the financial statements and in conducting the audit, and that KPMG US's role as an auditor was publicly disseminated in the annual reports to shareholders.

*Id.* at 166. On the facts alleged regarding publicly available information about KPMG's role as an auditor for the company, the court concluded that "[i]t is . . . appropriate to infer that in 1998 and 1999, investors reasonably attributed the statements contained in the quarterly and annual reports to KPMG US." *Id.* at 167.

The Second Circuit has additionally held that plaintiffs may adequately plead reliance against corporate officers for statements appearing in analyst reports not directly attributed to the officers. In *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), the Second Circuit rejected the contention that the plaintiffs had "not adequately alleged that statements made by securities analysts can be attributed to the . . . defendants [the corporation and high-level officers]" under the fraud-on-the-market theory of reliance. The court noted that in § 10(b) litigation a corporation and its officers could be liable for misleading information appearing in analyst reports when the corporation and its officers either "(1) 'intentionally foster[ed] a mistaken belief concerning a material fact' that was incorporated into reports; or (2) adopted or placed their 'imprimatur' on the reports." *Id.* (quoting *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163-64 (2d Cir. 1980)) (alterations in original). The plaintiffs' complaint in *Novak* alleged, among other things, that the defendants made numerous misleading statements that were used by analysts in forming their opinions about the prospects of the company. *See Novak v. Kasaks*, 997 F.Supp. 425, 427-28 (S.D.N.Y. 1998). The Second Circuit found sufficient attribution in the plaintiffs' allegations that the defendants "made misstatements that were later incorpo-

rated into analysts' reports and [the defendants] subsequently (at least implicitly) adopted the contents of those reports." 216 F.3d at 314.

In each of these cases, the courts analyzed the precise relationship between the defendant and the entity or analyst issuing the allegedly misleading statement in order to determine whether the statement was attributable to the defendant. We likewise look to the nature of the relationship between the defendants (JCG and JCM) and the Janus funds in the present case to determine whether statements in the Janus fund prospectuses were attributable to JCG or JCM.

According to the complaint, JCM in its role as investment advisor to the Janus funds "is responsible for the day-to-day management of [the] investment portfolio and other business affairs of the funds" and "furnishes advice and recommendations concerning the funds' investments, as well as administrative, compliance and accounting services for the funds." J.A. 206-07. "While each mutual fund is in fact its own company, as a practical matter the management company [that is, JCM] runs it." J.A. 212. And "[t]he portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the same management company, not the mutual funds themselves." J.A. 212.

Interested investors would know that JCM is listed as investment adviser to the funds in the prospectuses and the statements of additional information for each of the Janus funds, and its duties are detailed in these documents. For example, under the heading "Management of the Fund," the February 25, 2002, prospectus for the Janus Mercury Fund lists only an investment adviser, JCM,[3] and a portfolio manager, Warren Lammert, who was executive vice president of

---

[3]At the time the investment advisor was called Janus Capital Corporation. It has since been renamed JCM, and we refer to it as JCM.

the fund. The Janus Mercury Fund prospectus explains that the investment adviser "furnishes continuous advice and recommendations concerning the Fund's investments" and "also furnishes certain administrative, compliance and accounting services for the Fund." J.A. 109. The February 25, 2002, statement of additional information for the Janus Equity and Income Funds (supplemented April 2, 2002, May 13, 2002, and May 31, 2002) further explains that JCM, as investment adviser, will "provide office space for the Funds, and pay the salaries, fees and expenses of all Fund officers and of those Trustees who are affiliated with [JCM]." J.A. 366. Pursuant to the advisory agreements between the funds and JCM, "[JCM] furnishes certain other services, including net asset value determination and fund accounting, recordkeeping, and blue sky registration and monitoring services, for which the Funds may reimburse [JCM] for its costs." *Id.*

The statement of additional information also notes that Janus Distributors LLC, a wholly-owned subsidiary of JCM, is a distributor of the funds. And the District Court observed previously in a related action that two fund defendants in that action, Janus Investment Fund and Janus Adviser Series, are merely "trusts that hold assets belonging to shareholders of the fund." *In re Mut. Funds Inv. Litig.*, 384 F.Supp.2d 845, 852-53 n.3 (D. Md. 2005). The defendants in that litigation asserted that the Janus Investment Fund and Janus Adviser Series have no assets separate and apart from those they hold for shareholders. *Id.* at 853 n.3.

To the interested investor familiar with the organizational structure of mutual funds, plaintiffs' allegations here would have been readily known or ascertainable. Such an investor would understand that "[a] mutual fund does not operate on its own or employ a full time staff." Clifford E. Kirsch, Mutual Fund Organizational Structure Powerpoint Presentation, *in Nuts & Bolts of Financial Products 2005* (Practising Law Institute 2005), at 359. Consequently, "[m]ost of the operations of a mutual fund are carried out by service provid-

ers." Bibb L. Strench & Kathryn L. Quirk, The Advisory Relationship/Portfolio Management, Outline, *in The ABCs of Mutual Funds 2006* (Practising Law Institute 2006), at 207. As the SEC has explained,

> Unlike most business organizations . . . mutual funds are typically organized and operated by an investment adviser that is responsible for the day-to-day operations of the fund. In most cases, the investment adviser is separate and distinct from the fund it advises, with primary responsibility and loyalty to its own shareholders.

Role of Independent Directors of Investment Companies; Final Rule, 66 Fed. Reg. 3734, 3735 (Jan. 16, 2001); *see also* Strench & Quirk at 207 (noting that "the investment adviser[ ] is primarily responsible for the day-to-day management of the mutual funds' investment portfolio"). The investment adviser "determines the composition of assets of the mutual funds, including the instruments to be purchased, exchanged, retained or sold, the amounts of cash and other investments, and the timing of the execution of these actions." Strench & Quirk at 207. The SEC has also noted that "[a]s a result of their extensive involvement, and the general absence of shareholder activism, investment advisers typically dominate the funds they advise." 66 Fed. Reg. at 3735 n.3.

The inference that interested investors would attribute to JCM a role in the preparation or approval of the allegedly misleading prospectuses is further strengthened by the fact that JCG and JCM and the Janus funds held themselves out to the investing public as a single entity: "Janus." Defendants and the funds maintain a single website which contains prospectuses for all of the Janus funds and which is used to disseminate the prospectuses to the investing public. As the statement of additional information for the Janus Equity and Income Funds explains, "[p]romotional expenses in connection with offers and sales of shares are paid by [JCM]," J.A.

371, indicating an active role by JCM in the promotion and sale of shares in the Janus funds.

We conclude, at the Rule 12(b)(6) stage, that given the publicly disclosed responsibilities of JCM, interested investors would infer that JCM played a role in preparing or approving the content of the Janus fund prospectuses, particularly the content pertaining to the funds' policies affecting the purchase or sale of shares. It was publicly known that JCM furnished advice and recommendations concerning the Janus funds' investment decisions and even made NAV determinations, which in part enabled market timing. In light of the publicly available material, interested investors would have inferred that if JCM had not itself written the policies in the Janus fund prospectuses regarding market timing, it must at least have approved these statements. This circumstance is sufficient to support the adequacy of plaintiff's pleading of fraud-on-the-market reliance as to JCM.

Our analysis is fully consistent with the Supreme Court's decision in *Stoneridge*. In *Stoneridge* purchasers of common stock in Charter Communications, Inc. (Charter) brought a § 10(b) action alleging violations by a number of parties including Scientific-Atlanta, Inc. and Motorola, Inc., two suppliers of Charter. According to the allegations, Charter engaged in economically substanceless transactions with suppliers that inflated Charter's revenue. 128 S. Ct. at 766-67. Suppliers in their own financial statements booked the transactions as a wash in accordance with generally accepted accounting principles. *Id.* at 767. On the facts before it the Court concluded that the suppliers' "deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance." *Id.* at 770. The Court reasoned that "[i]t was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." *Id.* While *Stoneridge* makes clear that the fraud-on-the-market presumption does not apply

to transactions that are not publicly disclosed, the holding in *Stoneridge* has no application to a situation in which the allegedly misleading statements are indisputably public and the inquiry is focused solely on whether the investing public would have attributed a particular statement to a particular defendant.

Finally, we hold that plaintiffs' allegations of attribution, while sufficient to implicate JCM in its role as investment advisor, are insufficient to reach JCG. As we have noted, an investment advisor is well known to be intimately involved in the day-to-day operations of the mutual funds it manages. We cannot say, however, that it would be apparent to the investing public that the investment advisor's parent company, which sponsors a family of funds, participates in the drafting or approving of prospectuses issued by the individual funds. Although JCG, like JCM, played a role in the dissemination of the fund prospectuses on the Janus website, this fact, taken by itself, is insufficient in this case for us to infer that interested investors would believe JCG had prepared or approved the Janus fund prospectuses.

B.

We turn next to the question of whether plaintiffs have successfully pled the element of loss causation.

In a § 10(b) case, "when courts require a showing of damages *proximately caused* by the defendant's conduct for liability, they require only that the plaintiff show that the defendant's conduct was a *substantial* cause of its injury." *Miller v. Asensio & Co., Inc.*, 364 F.3d 223, 229 (4th Cir. 2004) (emphasis in original); *see also Teachers'*, 477 F.3d at 186. That is, "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Miller*, 364 F.3d at 233 (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir.

1997)); *see also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (same). The facts alleged in the complaint therefore need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors. *See Miller*, 364 F.3d at 229 (noting that it is during the damages inquiry, not the earlier proximate cause inquiry, "that the exact amount of damages *solely* caused by the defendant's conduct must be calculated") (emphasis in original). As explained above, plaintiffs must plead loss causation "with sufficient specificity to enable [this] court to evaluate whether the necessary causal link exists." *Teachers'*, 477 F.3d at 186.

The complaint here adequately alleges that the false or misleading statements in the prospectuses drafted and disseminated by defendants were a substantial cause of the decrease in JCG's share price when the fraud was publicly revealed. The allegations are as follows. Materially misleading statements regarding defendants' policies on market timing fraudulently induced investors to purchase shares in the Janus funds, increasing the assets under management by JCM. JCM's management of the Janus funds' assets was responsible for generating more than ninety percent of JCG's revenue. Consequently, any decrease in the value of the assets in the various mutual funds would adversely affect JCG's revenues and profits.

According to the complaint, when the New York Attorney General broke the news on September 3, 2003, that hedge funds had been permitted to market time the Janus funds, JCG stockholders were damaged in several ways. First, JCG stockholders were damaged directly when JCG was required to pay more than $325 million in fines and penalties to settle claims by regulatory agencies relating to the allegations of improper market timing. Second, JCG stockholders were damaged when the assets under management by JCM decreased by $14 billion between September 2003 and February 2004. The complaint alleges that the large withdrawal of assets during

this period, which occurred at more than three and a half times the rate during the previous eight months, was causally connected to the Attorney General's revelations of fraud. Because JCG's profitability, as conceded in its Form 10-K, was directly linked to the amount of assets under JCM's management (that is, the amount of assets in the Janus funds), it was inevitable that the significant withdrawal of assets from the Janus funds would impact JCG's common stockholders.

Plaintiffs' allegations are therefore sufficiently specific to establish that the misleading statements in the prospectuses were a substantial factor in the decline in the value of JCG's common stock. Indeed, plaintiffs note that between September 2 and September 4, 2003, the days immediately preceding and following the public revelation of the Attorney General's complaint, the share price of JCG's common stock dropped by 12.7 percent from $17.68 to $15.60. The rapid decline of JCG's common stock price following the news of market timing in the Janus funds indicates a substantial causal link between the misleading prospectuses used to sell shares in the Janus funds and the value of JCG's stock.

### III.

We turn now to plaintiffs' allegations of scheme liability. Plaintiffs assert that:

> During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein and (ii) cause plaintiff and other members of the Class to purchase [JCG] securities at artificially inflated prices.

J.A. 242. Plaintiffs contend that JCG and JCM may be held liable under § 10(b) for their participation in this fraudulent scheme.

After plaintiffs filed their complaint, the Supreme Court decided *Stoneridge* and clarified the contours of scheme liability in private securities actions. Although *Stoneridge* did not eliminate scheme liability, the opinion made clear that for a secondary actor to be liable for securities fraud under § 10(b), that actor "must satisfy each of the elements or preconditions for liability." 128 S. Ct. at 769. That is, the existence of a fraudulent scheme does not permit a plaintiff to avoid proving any of the traditional elements of primary liability, such as scienter and reliance. Since we have already analyzed the challenged elements for primary liability for each of the defendants above, there is no need for us to conduct a separate inquiry on scheme liability.

## IV.

Given our conclusion that the complaint does not plead an adequate claim of primary liability against JCG, the final issue we must resolve is whether plaintiffs have successfully pled a claim of control person liability against JCG under § 20(a) of the Act. Pursuant to § 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2006). A claim of control person liability must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). "[O]nce the plaintiff establishes the prima facie case [of con-

trol], the burden shifts to the defendant to show lack of culpable participation or knowledge." *Id.*

We have already determined that the predicate violation requirement has been met; plaintiffs have successfully pled a claim of primary liability against JCM. To plead the control requirement, a plaintiff must

> plead[ ] facts showing that the controlling defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 661 (E.D. Va. 2000) (quoting *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (alterations in original)). SEC regulations define "control" as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2 (2008); *see also* H.R. Rep. No. 73-1383, at 26 (1934) ("[W]hen reference is made to 'control', the term is intended to include actual control as well as what has been called legally enforceable control."). In making the determination of whether a defendant possessed the requisite control, "the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890-91 (3d Cir. 1975). And, ultimately, as a "complex factual question," *S.E.C. v. Coffey*, 493 F.2d 1304, 1318 (6th Cir. 1974), assessing control person liability is "not ordinarily subject to resolution on a motion to dismiss," and dismissal should be granted only when "a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person," *Maher*, 144 F.3d

at 1306; *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) ("Control is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.' The issue raises a number of complexities that should not be resolved on such an underdeveloped record.") (quoting 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.24(1) (4th ed. 2002)) (internal citation omitted).

Plaintiffs' allegations adequately plead control of JCM by JCG. First, plaintiffs have alleged that JCG wholly owned JCM. The Eleventh Circuit has specifically noted that "[t]he legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008) (citing H.R. Rep. No. 73-152, at 12 (1933)). Regarding control in the corporation context, one commentator explained:

> An enterprise may control another organization and, indirectly, that organization's agents and employees. An enterprise's section 15 or 20(a) control of another organization may arise from virtually any source on which any other controlling person's status can be based. For example, a corporation may be a controlling person when it owns the majority of the shares of another corporation on the basis of its authority to control (legal control) the subsidiary.

Loftus C. Carson, II, The Liability of Controlling Persons Under the Federal Securities Acts, 72 *Notre Dame L. Rev.* 263, 314 (1997); *see also Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F.Supp. 587, 590-91 (S.D.N.Y. 1990) (holding that plaintiffs' allegation that defendants were sole shareholders of the allegedly controlled corporation "clearly meets" the § 20(a) standard).

Second, plaintiffs have alleged that JCG and JCM shared a common director, Helen Hayes. Hayes was both a director of JCG during the class period and Managing Director of Investments and a portfolio manager at JCM. The complaint alleges that "[s]he served in a day-to-day supervisory position at [JCM] and had the power to control its operations." J.A. 245. Additionally, Mark Whiston, the CEO and President of JCG during part of the class period, was previously President of Retail and Institutional Services at JCM. The complaint alleges that Whiston commissioned an inquiry into market timing in the Janus funds. The complaint also includes an excerpt from a September 5, 2003, press release by JCG in which Whiston is quoted as saying that he had long viewed market timing as an industry-wide problem and that "[i]t's our hope that the [anti-market timing] measures [JCG is] announcing today will help resolve this situation in a way that recognizes the importance of the matter." J.A. 233. The complaint alleges that "[a]cting on behalf of [JCG], Mr. Whitson [sic], and through him, [JCG], had and exercised the power to control the activities of [JCM]." J.A. 245.

Finally, the complaint quotes passages from the New York Attorney General's complaint in which JCG employees discuss market timing policies and actions taken to prevent timing in a manner indicating presumptive control over the market timing activities. Specifically, the complaint includes a comment from an unnamed JCG source that states: "Our stated policy is that we do not tolerate timers. As such, we won't actively seek timers, but when pressed and when we believe allowing a limited/controlled amount of timing will be in *JCG's* best interests (increased profitability to the firm) we will make exceptions under these paramaters [sic]." J.A. 232 (emphasis added).

Taken together, plaintiffs' allegations of complete ownership of JCM by JCG, overlapping management between JCG and JCM, control of JCM by JCG executives, and presumptive authority by JCG to regulate market timing activity in the

Janus funds are sufficient to plead a prima facie case of control person liability.

V.

In sum, we conclude that plaintiffs have pled a viable claim of primary § 10(b) liability against JCM and have adequately pled that JCG may be liable as a control person of JCM under § 20(a). We therefore reverse the district court's grant of defendants' motion to dismiss as to both defendants. We remand the case to the district court for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

SHEDD, Circuit Judge, concurring:

I concur in the judgment of the majority that liability may be imposed as to both JCM and JCG. The majority holds that JCM may be primarily liable under § 10(b) and JCG may be liable as a control person under § 20(a). While I agree with these holdings, I would also hold that the plaintiffs have properly plead a claim that JCG is primarily liable for making false statements in the Janus funds' prospectuses under § 10(b). I believe JCG's alleged involvement and facilitating access to the false statements is sufficient to impose primary liability on JCG.

In order to plead a proper case that JCG is primarily liable, a plaintiff must plead, among other elements, that JCG made a misrepresentation that is public and attributable to JCG. As the majority correctly holds, "the Janus funds prospectuses are unquestionably public." *Majority Op.*, at 16. Thus, the only question is whether the plaintiffs have properly plead a basis that the statements are sufficiently attributable to JCG as a "maker" of the false statement. I believe they have done so. In their complaint, the plaintiffs allege that JCG

makes the most recent prospectus for each Janus Fund available on its website, *www.janus.com*. These prospectuses, which are given to prospective shareholders, included language that said Janus' funds were not intended for market timing or excessive trading and said Janus had measures in place to stop the trading. These statements were materially false and misleading.

J.A. 212-13. (internal quotation marks omitted). I believe the plaintiffs have properly alleged that JCG made a false statement by publishing these funds' prospectuses on its website, and a reasonable investor would attribute these public statements to JCG.