WYNN, Circuit Judge,
concurring in the judgment:
I concur in the majority’s judgment but write separately because I read Plaintiffs’ complaint more broadly than the majority. While it is true that Plaintiffs make a securities fraud allegation based, at least in part, on press releases that Penn issued between March 20 and June 6, 2008, I believe that Plaintiffs claim more generally that Penn wrongly failed to disclose that the leveraged buyout would likely not close.
Nonetheless, even under my broader reading of the complaint, I agree with the majority’s judgment that Plaintiffs’ Third Amended Complaint founders. That is because the alleged corrective disclosures tell nothing of the alleged fraud, and, even assuming for the sake of argument that the alleged disclosures did reveal that the leveraged buyout would likely not close, the market had already come to that conclusion.
*479 I.
As the majority notes, the Third Amended Complaint alleges that Penn issued seven press releases between March 20 and June 5, 2008, notifying the public of state regulatory approvals. Further, on June 6, 2008, Penn issued an eighth press release announcing the extension of the leveraged buyout closing date by 120 days, from June 15 to October 13, 2008. The June 6 press release stated that the extension was necessary to secure regulatory approvals from Illinois, Indiana, Louisiana, Maine, and Missouri. Plaintiffs allege that while Penn behaved publicly, through these releases, as if the leveraged buyout would close, Penn was involved in private discussions with the buyers and financing institutions about the renegotiation or termination of the buyout.
The Third Amended Complaint also alleges more broadly that Penn failed to disclose that the buyout might not close. For example, in paragraph 34 Plaintiffs contend that “[djuring the period from March 20, 2008 through June 15, 2008 inclusive, Defendants never informed or apprised the investing public of such material developments (ongoing termination and/or renegotiation discussions).” After explaining that the decision to terminate the buyout had likely occurred by May 2008, Plaintiffs allege, in paragraph 55, that “Defendants did not previously disclose the potential merger termination to the investing public or, in any way, indicate to the investing public that the Purchaser and/or banks were seeking to materially renegotiate the buyout price and/or terminate the previously announced, published and stockholder-approved cash buyout/merger agreement.”
Additionally, in paragraph 57, Plaintiffs allege that “after months of undisclosed negotiations between the Defendants, Purchaser, the financing banks, as well as with each party’s respective advisors and counsel, the parties waited until July 3, 2008 to finalize the Termination and Settlement Agreement....” Plaintiffs contend in paragraph 61 that “Defendants deliberately elected not to disclose or apprise the investing public that the original buyouf/merger agreement was ever in jeopardy or that termination or modification negotiations were taking place in order to keep Penn share prices artificially inflated.” Per paragraph 62, Penn’s “affirmative misrepresentations, along with the concealments of the ongoing negotiations and discussions ... influenced Plaintiffs and the Class to retain and/or purchase additional Penn shares.” Accordingly, per paragraph 65, “[b]y concealing material information concerning the termination negotiations, Defendants were artificially manipulating the open market price and obstructing the operation of the market as indices of the stock’s true value.... ”
Because of these and other allegations in the Third Amended Complaint, I believe that Plaintiffs claim more generally that Penn wrongly failed to disclose that the leveraged buyout would likely not close. I therefore diverge from the majority’s suggestion that the alleged securities fraud is tied exclusively to the press releases that Penn issued between March 20 and June 6, 2008.
II.
I agree with the majority that affirmative (mis)statements or half-truths can serve as the basis for 10b-5 liability. But so can omissions — that is, the failure to disclose material facts that the plaintiffs “ha[ve] the right to know.” See, e.g., Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151-153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (“It is no answer to urge that, as to some of the petitioners, these defendants may have made no positive representation or recom *480 mendation. The defendants may not stand mute” when in possession of material information that those buying and selling securities have a right to know.); Cox v. Collins, 7 F.3d 394, 396 (4th Cir.1993) (noting that plaintiffs alleged securities fraud by positive misrepresentation and by nondisclosure of material information and affirming denial of judgment as a matter of law in the face of conflicting evidence regarding the “materiality of the alleged omissions and [defendant’s] alleged knowledge and intent to deceive”).
Nevertheless, even read more broadly to encompass Penn’s general failure to disclose that the buyout would likely be terminated, the Third Amended Complaint still fails to successfully plead loss causation. To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, a plaintiff must plead “(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation (that is, the economic loss must be proximately caused by the misrepresentation or omission).” Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir.2009) (internal quotation marks and emphasis omitted).
Regarding the last two elements, the Supreme Court, in Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), recently made clear that securities fraud suits are permitted “where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.” Id. at 346, 125 S.Ct. 1627. In other words, the alleged facts must show that the misrepresentation or omission was “one substantial cause of the investment’s decline in value.” In re Mutual Funds Inv. Litig., 566 F.3d 111, 128 (4th Cir.2009) (internal quotation marks omitted). Only then may we conclude that the complaint alleges the necessary causal link between the defendant’s alleged fraud and the plaintiffs economic harm. See Dura Pharm., 544 U.S. at 346-47, 125 S.Ct. 1627. Therefore, as the majority notes, because the Third Amended Complaint relies upon the cumulative effect of a series of partially corrective disclosures to plead loss causation, it must state facts showing that those disclosures gradually revealed to the market the undisclosed truth about Penn’s fraud and resulted in a decline of Penn’s share price.
Plaintiffs allege that the following purported corrective disclosures leaked the truth onto the market: (1) Maine, Louisiana, and Missouri regulators failed to take action regarding the transaction in June 2008; (2) Illinois regulators approved the transaction in June 2008 but Penn failed to announce that approval in a press release; and (3) One brokerage firm suspended coverage of Penn’s stock in June 2008, while another made negative comments regarding the likelihood of the merger’s consummation. None of these events revealed in any way that Penn and other parties to the buyout were discussing terminating or restructuring the transaction.
The one regulatory approval and three regulatory board failures to act disclosed nothing other than that which Penn had already made clear, in the leveraged buyout agreement filed with the Securities and Exchange Commission and in Penn’s June 6, 2008 press release: Penn sought regulatory approval for the buyout, and the regulatory approval process would not be completed by June 15, 2008. These regulatory events, therefore, did not reveal Penn’s alleged fraud.
Further, one stock brokerage’s suspension of coverage and another’s negative *481 comments did not constitute corrective disclosures. On June 24, 2008, Susquehanna Financial Group, LLP announced that it was suspending its coverage of Penn’s stock. In doing so, Susquehanna expressly noted that “any opinion about whether or not the deal will close or not close is pure speculation, in our view.” Susquehanna’s announcement cannot, particularly in the face of that caveat, constitute a corrective disclosure that Penn and other parties to the buyout were discussing terminating or restructuring the transaction.
Oppenheimer Analysts issued a report indicating that “the markets have become increasingly convinced that the company’s merger will not be completed.” But that June 24, 2008 statement did not say anything other than that which Lehman Brothers had indicated in its April 1, 2008 report attached to Plaintiffs’ Third Amended Complaint — that the deal was unlikely to be consummated, especially given general economic deterioration, credit market deterioration, and then-recent headlines about other distressed and cancelled leveraged buyouts. Lehman Brothers’ April 1, 2008 report estimated the likelihood of the deal’s closing to be between 21 and 32 percent. Not surprisingly, therefore, Penn’s share price steadily declined from the time the buyout was announced to May 2008, the time of the alleged decision to renegotiate or terminate the deal.
In any event, neither the Oppenheimer report nor the Susquehanna announcement disclosed to investors that the parties were terminating or renegotiating the deal. Moreover, the Lehman Brothers report from April 1, 2008, among other things, indicates that the market had decided well before May 2008 that Penn’s buyout would likely fall through.
Under these circumstances, the alleged corrective disclosures failed to disclose Penn’s alleged fraud, and, even assuming for the sake of argument that the alleged disclosures did reveal that the leveraged buyout would likely not close, the market had already come to that conclusion. With their Third Amended Complaint, Plaintiffs therefore still fail to successfully plead loss causation. For this reason, I concur in the majority’s judgment.