PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT H. KATYLE; JOSEPH T. SMALL; BRENT STILLE, Individually and on behalf of all others similarly situated,

　　　　　*Plaintiffs-Appellants,*

　　　　　and

HERMAN MARTIN BRAUDE,

　　　　　*Plaintiff,*

　　　　　v.

PENN NATIONAL GAMING, INCORPORATED; PETER M. CARLINO; WILLIAM J. CLIFFORD,

　　　　　*Defendants-Appellees.*

No. 09-2272

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:08-cv-01752-PJM)

Argued: October 26, 2010

Decided: March 14, 2011

Before KEENAN and WYNN, Circuit Judges, and
Bobby R. BALDOCK, Senior Circuit Judge of the
United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Affirmed by published opinion. Senior Judge Baldock wrote the opinion, in which Judge Keenan joined. Judge Wynn wrote a separate opinion concurring in the judgment.

---

## COUNSEL

**ARGUED:** Herman Martin Braude, BRAUDE & MARGU-LIES, PC, Washington, D.C., for Appellants. Paul K. Rowe, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, for Appellees. **ON BRIEF:** Joseph C. Garland, BRAUDE & MARGULIES, PC, Washington, D.C., for Appellants. Adam M. Gogolak, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; Kevin B. Collins, Danielle M. Estrada, COVINGTON & BURLING, LLP, Washington, D.C., for Appellees.

---

## OPINION

BALDOCK, Senior Circuit Judge:

The Private Securities Litigation Reform Act of 1995 (PSLRA) states that a private plaintiff claiming an implied right of action for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), must prove, among other things, "loss causation," *i.e.*, that the defendant's material misrepresentation or omission "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Of course in this Circuit, pleading practice requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007). On appeal, Plaintiffs, representing a putative class of investors which purchased common shares of Defendant Penn National Gaming (Penn) in vain anticipation of an

announced third-party buyout, do not challenge the district court's dismissal of their Second Amended Complaint (SAC) based on its failure to adequately allege loss causation. Rather, Plaintiffs challenge the district court's refusal to allow them to file their proposed Third Amended Complaint (TAC) because, according to the court, it too fails to adequately allege loss causation.

The sole issue presented here is whether Plaintiffs' TAC sufficiently alleges loss causation based upon a purported series of partially corrective disclosures of a recurring material omission, such that the district court abused its discretion in refusing to vacate its judgment of dismissal and grant Plaintiffs leave to amend.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we hold that the district court properly declined to disturb its judgment and allow amendment because the series of partial disclosures identified in the TAC did not inform the market of Penn's alleged ongoing fraudulent omission. *See US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 320 (4th Cir. 2010) (holding that the district court did not abuse its discretion in denying leave to amend where the proposed amendment "would have no impact on the outcome of the motion to dismiss"). Accordingly, we affirm.

## I.

In adjudicating the sufficiency of the TAC, we, like the district court, accept as true the TAC's well-pleaded factual allegations, but owe no allegiance to "unwarranted inferences, unreasonable conclusions, or arguments" drawn from those

---

[1]To maintain a § 10(b) securities fraud action, a plaintiff must adequately plead (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). In addressing the sufficiency of the TAC's allegations concerning loss causation, we simply assume without deciding the adequacy of the TAC's allegations bearing upon the additional elements of Plaintiff's § 10(b) securities fraud claim.

facts. *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009) (internal quotation marks omitted). We may consider as well other sources that courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss a securities fraud complaint, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Facts recited herein that are not contained within the four corners of the TAC are either found in documents referred to in the TAC or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and thus properly subject to judicial notice under Fed. R. Evid. 201. *See*, *e.g.*, *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering stock analyst reports cited in the complaint in the context of a motion to dismiss); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices in the context of a motion to dismiss).

A.

Penn is a publicly-owned corporation traded on the NASDAQ. Penn operates numerous gaming and off-track betting facilities in several states. Plaintiffs represent a putative class of investors that purchased common shares of Penn between March 20, 2008 and June 15, 2008, inclusive. One year prior to the class period's end date, on June 15, 2007, Penn announced in a press release that it had entered into a leveraged buyout agreement (LBO) with private equity buyers:

> Penn National Gaming . . . entered into a definitive agreement to be acquired by certain funds managed by affiliates of Fortress Investment Group LLC . . . and Centerbridge Partners LP in an all-cash transaction valued at approximately $8.9 billion, including the planned repayment of approximately $2.8 billion of Penn National's outstanding debt.

> Under the terms of the agreement, Penn National shareholders will receive $67.00 in cash for each outstanding Penn National share. The purchase consideration represents a premium of approximately 31% over Penn National's closing share price on June 14, 2007 [of $51.14 per share]. Penn National Gaming has approximately 85.5 million shares outstanding.

Joint Appendix (JA) at A36. Deutsche Bank and Wachovia Securities committed to finance roughly $7 billion of the LBO. The LBO was set to close on or before June 15, 2008, subject to a 120-day extension in the event all state regulatory approvals had not been forthcoming. Under the terms of the LBO, the purchase price was to increase 1.49c for each day the closing was extended beyond June 15.

On the day of the LBO's announcement, Penn's common stock gained $11.98 to close at $62.12 per share, $4.88 below the agreed buyout price of $67 per share. On November 9, 2007, Penn filed with the Securities and Exchange Commission (SEC) a proxy statement which, among other things, detailed the terms of the LBO and the circumstances under which the LBO might be terminated. On December 12, 2007, Penn's shareholders voted to approve the LBO. At the end of 2007, Penn's shares were priced at $59.55, a $7.45 or approximately 11% discount off the buyout price. The price levels of Penn's stock throughout the latter half of 2007 reflected the market's initial view that the odds of the Penn buyout closing were favorable. But given the economic downturn of 2008 and, specifically, the turmoil in the credit markets, shareholder confidence that the buyout would close, as reflected in Penn's stock price, proved unsustainable. By March 20, 2008, the beginning date of Plaintiffs' class period, Penn's stock price had dropped to $40.58 per share, a $26.42 or nearly 40% discount off the buyout price.

According to a Lehman Brothers report dated April 1, 2008, just ten days after commencement of the class period,

Penn's stock price following announcement of the LBO had fallen from a high of $63.68 on June 19, 2007 to a low of $38.76 on March, 10, 2008. Recognizing that the "target-friendly" terms of both the LBO and the lenders' debt commitment letter might lessen the buyers' and/or lenders' incentives to act aggressively against Penn in the event of disagreement or difficulty, Lehman Brothers nonetheless explained:

> Much has changed since June 2007, which perhaps represented the peak of the leveraged buyout boom. . . . The credit environment has deteriorated from the very favorable conditions experienced during the first half of 2007 to extremely difficult. . . . Many private equity transactions have either been cancelled or face continuing difficulty as targets, private equity firms, and lenders disagree on the original terms of the mergers. . . .
>
> *We cannot predict whether the Penn transaction will close*, especially given recent headlines regarding other distressed or cancelled leveraged buyout transactions.

JA at A448 (emphasis added).[2] Citing increased competition and earnings pressure in the gaming industry, Lehman Brothers observed that since Penn's announcement of the LBO in June 2007, the prices of comparables, such as Boyd Gaming and Pinnacle Entertainment, had dropped an average of 60%. Lehman Brothers opined that "[t]he high price paid for Penn at the peak of the LBO boom and the significant decline in

---

[2]Prior to the commencement of the class period and just one month prior to the Lehman Brothers Report, Penn warned in its SEC Form 10-K Annual Report for 2007, filed February 29, 2008, that its stock price might be adversely affected "if any event change or other circumstance occurs that results in the termination of the Merger Agreement (including a failure by Parent to obtain the necessary debt financing in light of current market conditions)." JA at A311.

comps are negative factors for Penn in the sense that they could create incentives for both Fortress/Centerbridge to look for outs and for lenders to act aggressively against the sponsors." JA at A454.

Lehman Brothers noted that over the first quarter of 2008, Penn's stock price had "fallen sharply despite the lack of negative news regarding the actual transaction." JA at A448. Lehman's further noted that "on March 25, 2008, Fortress publicly reaffirmed its commitment to complete and fund the acquisition by Summer 2008." JA at A448. Consistent therewith, the TAC alleges:

> From March 20, 2008 through the middle of June 2008, through official press releases . . . , [Penn] issued frequent updates and announcements related to the planned buyout — all of them relating to securing transaction approval by various state regulatory gaming agencies of the proposed buyout/merger agreement, calculated to influence the investing public and shareholders that the buyout/merger transaction, as contained in the original SEC filings and the proxy statement was still in effect.

JA at A1007. Specifically, Penn issued seven press releases between March 20 and June 5, 2008, notifying the public of state regulatory approvals.[3] Then, on June 6, 2008, Penn issued an eighth press release announcing the extension of the

---

[3]The TAC identifies seven press releases announcing transaction approval by various entities between March 20 and June 5, 2008 as follows: 1) on March 20, from the West Virginia Lottery Commission; 2) on April 15, from the New Mexico Gaming Board; 3) on April 16, from the Pennsylvania State Horse Racing Commission and the New Mexico Racing Commission; 4) on April 17, from the Mississippi Gaming Commission; 5) on May 15, from the West Virginia Racing Commission; 6) on May 29, from the Pennsylvania State Gaming Control Board; and 7) on June 5, from the Iowa Racing and Gaming Commission. JA at A1008-09.

closing date by 120 days, from June 15 to October 13, 2008, pursuant to the terms of the LBO. The release stated the extension was necessary to secure the approval of five remaining states, *i.e.*, Illinois, Indiana, Louisiana, Maine, and Missouri. Penn's stock price closed that day at $45.76 per share.

The problem, according to the TAC, was that while Penn continued to behave publicly throughout the class period as if the LBO would close, Penn was involved in private discussions with the buyers and financing institutions related to the renegotiation of the buyout price or the termination of the LBO. Based upon a host of inferences we need not detail here, the TAC alleges that by "at least March 20, 2008," Penn "knew or had reason to believe that the proposed cash buyout/merger transaction would not take place under the terms of the June 15, 2007 agreement." JA at A1007-08, A1011. Plaintiffs cite a confidentiality agreement between Penn and the buyers dated May 22, 2008, as illustrative of Penn's knowledge. Therein, the signatories agreed that discussions aimed at resolving disputes over the rights and obligations of the parties to the LBO would remain confidential and protected by the settlement privilege. The signatories further agreed that neither party would commence litigation related to the LBO while the confidentiality agreement remained in effect. The May 22 agreement expired on May 28, 2008, but was extended by a series of additional agreements through June 29, 2008.

The closing of the class period on June 15, 2008 is based on the TAC's allegation that "from June 16, 2008 through July 2, 2008," the day before Penn issued a press release announcing termination of the LBO, the truth surrounding Penn's ongoing material omission "leaked out to the market through a variety of leaks." JA at A1023 (capitalization omitted). Those leaks, which Plaintiffs claim individually constituted partially corrective disclosures of Penn's fraudulent press releases are identified in the TAC as follows:

- On June 16, the market learned the Maine Harness Racing Commission cancelled a meeting scheduled to address the LBO;

- On June 17, the market learned the Louisiana Gaming Control Board held a meeting without taking action on the LBO;

- On June 24, the market learned Penn failed to issue a press release announcing the Illinois Gaming Board had approved the LBO;

- On June 24, the market learned Susquehanna Financial Group suspended coverage of Penn's stock due to market uncertainty over whether the LBO would close;

- On June 24, the market learned Oppenheimer Analysts expressed doubts about the LBO's closing;

- On June 25, the market learned the Missouri Gaming Commission held a meeting without approving the LBO.

*See* JA at A1018-22. On June 16, 2008, the day these purported leaks allegedly began to disclose Penn's fraud on the market, the price of Penn's stock opened at $44.18 per share. When the leaks concluded on June 25, 2008, the price of Penn's stock closed at $34.14 per share, down $10.04 or 22% from its June 16 opening. According to the TAC:

> After Penn National failed to issue a press release announcing the Illinois approval by the close of business Friday, June 27, 2008, "the cat was out of the bag" — the market knew that the Penn National deal would not close. Accordingly, Penn National's stock declined from $33.84 on Monday June 30, 2008, to

$28.60 on Wednesday June [sic] 2, 2008, a fall of $5.39 or 15. 86%. . . . This removes most but not all, of the price inflation [due to Penn's fraud] from Penn National's stock.

JA at A1022.

On July 3, 2008, before the market opened, Penn announced the termination of the LBO in a press release. Peter Carlino, Penn's Chief Executive Officer, commented that Penn's decision to enter into a settlement agreement followed "a thorough evaluation of a wide range of alternatives for consummating the transaction." JA at A678. The release stated that as part of the settlement agreement, Penn would receive $1.475 billion, consisting of a $225 million cash termination fee and the purchase of $1.25 billion of Penn's preferred stock due 2015 by affiliates of Fortress/Centerbridge, Deutsche Bank, and Wachovia Securities. Penn also announced it would repurchase up to $200 million of its own common stock over the following 24 months. Penn's stock price closed that day at $29.66 per share, up 96¢ over its opening. After the market closed on July 9, 2008, Penn filed its SEC Form 8-K detailing the terms and conditions of the settlement agreement. Over the next two days, Penn stock fell $4.88 from its close on July 9 of $29.35 per share to its close on July 11 of $24.47 per share. According to the TAC, "on July 11, 2008, for the first time, all of the artificial price inflation resulting from Penn National's fraud was finally removed from Penn National's stock price." JA at A1027. As a postscript, the Wall Street Journal, in an article dated July 5, 2008, noted that in 2008 a "record number" of LBO's involving domestic targets had been terminated short of closing: "In many of the situations where deals fell apart, banks and companies accused the private-equity firms of buyers' remorse, while the buyout firms have accused the banks of lenders' remorse. The truth is somewhere in between." JA at A721.

## B.

In contrast to the TAC's allegation that the market became aware of Penn's fraud through a series of partially corrective disclosures prior to July 3, 2008, Plaintiffs' SAC alleged the market became aware of such fraud upon Penn's July 3 press release announcing the LBO's termination. According to the SAC, Penn's ongoing material omission over the course of the class period proximately caused Plaintiffs economic harm when the artificially inflated price of Penn's shares fell after the truth about the ill-fated LBO became known on July 3. The district court, however, granted Penn's motion to dismiss the SAC based upon its failure to adequately plead loss causation. The court observed that Penn's stock price closed up 96¢ on July 3. That, said the court, proved fatal to the SAC's theory of loss causation and to Plaintiffs' securities fraud claim (a point on which we express no opinion). Plaintiffs did not challenge the district court's rationale for dismissal, only its decision to dismiss the SAC with prejudice. To that end, Plaintiffs filed a "motion for reconsideration" in which they sought leave to file their TAC. The court denied Plaintiffs' motion in a memorandum to counsel because "allowing Plaintiffs to replead would be futile." JA at A1158. The court reasoned:

> Under the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), in order to plead loss causation with particularity, Plaintiffs must allege that Penn's "share price fell significantly after the truth became known." They remain unable to meet this standard because none of the events Plaintiffs now raise constitutes a "corrective disclosure" under the Supreme Court's decision in *Dura* and its progeny; furthermore, none of the events Plaintiffs cite can be said to have caused any significant fall in [Penn's] stock price.

JA at A1158. Plaintiffs timely appealed.

## II.

Plaintiffs assert the district court erred in denying what, in effect, was a postjudgment motion for leave to file their TAC. In *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc), we explained that a district court may not grant a post-judgment motion to amend the complaint unless the court first vacates its judgment pursuant to Fed. R. Civ. P. 59(e) or 60(b).[4] To determine whether vacatur is warranted, however, the court need not concern itself with either of those rules' legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a). In other words, a court should evaluate a postjudgment motion to amend the complaint "under the same legal standard as a similar motion filed before judgment was entered — for prejudice, bad faith, or futility." *Laber*, 438 F.3d at 427; *accord Matrix Capital Mgmt. Fund, LP v. Bearingpoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009). Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile — that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (internal quotation marks omitted).

## A.

We review allegations of loss causation for "sufficient specificity," a standard largely consonant with Fed. R. Civ. P.

---

[4]The Federal Rules of Civil Procedure do not provide for a postjudgment "motion for reconsideration." Rather, they provide for a Rule 59(e) motion to alter or amend the judgment or a Rule 60(b) motion for relief from judgment. Because, consistent with Rule 59(e), Plaintiffs filed their motion within ten days of the district court's judgment, we construe it as arising under Rule 59(e). *See Shepard v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004).

9(b)'s requirement that averments of fraud be pled with particularity.[5] *In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 119-120 (4th Cir. 2009). The degree of specificity demanded is that which will "enable the court to evaluate whether the necessary causal link exists." *Teacher's Ret. Sys.*, 477 F.3d at 186. Because loss causation is fact-dependent, the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case. For instance:

> [W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was

---

[5]Rule 9(b) states that a party must plead "with particularity the circumstances constituting fraud." In *Tellabs, Inc.*, 551 U.S. at 319, the Supreme Court recognized that "[p]rior to the enactment of the PSLRA, the sufficiency of a complaint for securities fraud was governed not by [the general pleading standard of] Rule 8, but by the heightened pleading standard set forth in Rule 9(b)." The PSLRA sets forth specific standards for pleading the elements of misrepresentation and scienter, and thus supercedes Rule 9(b) to that extent. 15 U.S.C. § 78u-4(b)(1),(2). The PSLRA, however, does not address the pleading standards applicable to the remaining elements of a §10(b) claim, and so presumably the pleading standard of Rule 9(b) still applies to those elements. While the Supreme Court has not specifically addressed whether loss causation must be pled with particularity after enactment of the PSLRA, in *Teacher's Ret. Sys.*, 477 F.3d at 186, we recognized that "[a] strong case can be made that because loss causation is among the circumstances constituting fraud for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity." (internal quotation marks omitted). Uncertainty has arisen because in *Dura Pharm., Inc.*, 544 U.S. at 346-47, the Court applied Rule 8's "a short and plain statement" pleading standard to allegations of loss causation. Fed. R. Civ. P. 8(a)(2). But because the complaint in that case could not satisfy Rule 8's lesser standard, much less Rule 9(b)'s stricter standard, the Court only "*assume[d], at least for argument's sake*, that neither the Rules nor the [PSLRA] impose any special further requirement [beyond Rule 8] in respect to the pleading of proximate causation or economic loss." *Dura Pharm., Inc.*, 544 U.S. at 346 (emphasis added).

> caused by the alleged misstatements [or omissions] as opposed to intervening events.

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks omitted).

To be sure, "the facts alleged in the complaint . . . need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors." *In re Mutual Funds Inv. Litig.*, 566 F.3d at 128; *see also Lentell*, 396 F.3d at 177 ("We do not suggest that plaintiffs were required to allege the precise loss attributable to Merrill's fraud . . . ."). What we do require the alleged facts to show is that the misrepresentation or omission was "one substantial cause of the investment's decline in value." *In re Mutual Funds Inv. Litig.*, 566 F.3d at 128. Only then may we conclude that the complaint alleges the "necessary causal link" between the defendant's alleged fraud and the plaintiff's economic harm, or, in tort-related terms, that "the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Stated otherwise, the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct. *See Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004). "[I]f the connection is attenuated . . . a fraud claim will not lie. That is because the loss causation requirement — as with the foreseeability limitation in tort — is intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Lentell*, 396 F.3d at 174 (internal quotation marks and citations omitted).

## B.

In *Dura Pharm., Inc.*, the Supreme Court held a complaint asserting a violation of § 10(b) based upon a fraud on the market theory does not sufficiently allege loss causation simply by stating that the security price was artificially inflated at the

time of purchase, because "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Dura Pharm., Inc.*, 544 U.S. at 342. The Court explained that if the purchaser sells "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. [But] [i]f the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss." *Id.*

Because the Supreme Court acknowledged the relevant truth may "leak out," subsequent decisions have recognized that neither a single complete disclosure nor a fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient). *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230-31 (5th Cir. 2009) (per curiam) (recognizing a series of partially corrective disclosures may suffice to establish loss causation). Rather, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures [prompted] the stock price deflation." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009); *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation [prompted] the resulting decline in price."). The district court in this case properly recognized that because Plaintiffs' proposed TAC relies upon the cumulative effect of an alleged series of partially corrective disclosures to plead loss causation, the TAC must state facts that show (1) those disclosures gradually revealed to the market the undisclosed truth about Penn's fraudulent press releases, and (2) such disclosures resulted in the decline of Penn's share price.

III.

Here, *exposure* of the fact that Penn fraudulently omitted from its prior press releases the truth about the ill-fated status of the LBO is the first requisite to adequately pleading loss causation. In other words, to sufficiently plead loss causation under a fraud on the market theory, the TAC must provide a basis on which to conclude the six alleged corrective disclosures issued between June 16 and June 25, 2008, inclusive, revealed "new facts" suggesting Penn had perpetrated a fraud on the market by omitting in its eight prior press releases related to state regulatory approvals any mention that the LBO would not close as written. *Teachers' Ret. Sys.*, 477 F.3d at 187. Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, "if investors already know the truth, false statements won't affect the price."[6] *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010). Such disclosures need not precisely identify the misrepresentation or omission; nor need the disclosure emanate from any particular source. *See Lormand*, 565 F.3d at 264 n.32. But they must reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). The disclosure must "*at least relate back to the misrepresentation* and not to some other negative information about the company." *In re Williams Sec. Litig.*, 558 F.3d at 1140 (emphasis added).

---

[6]In *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988), the Court explained that "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." (internal quotation marks omitted). Thus, only the first revelation (or series of partial revelations) of facts apprising the market of the entire truth about prior misleading statements will affect a stock's price. Once the truth is revealed, the stock's price presumably adjusts and reflects the effect of the fraud.

A.

Let us first consider the TAC's allegations that (1) on June 16 the market learned the Maine Harness Racing Commission cancelled a meeting scheduled to address the LBO, (2) on June 17 the market learned the Louisiana Gaming Control Board held a meeting without taking action on the LBO, and (3) on June 25 the market learned the Missouri Gaming Commission held a meeting without approving the LBO. Recall that on June 6, 2008, Penn and the buyers announced, consistent with the terms of the LBO, that they had extended the deal's closing until no later than October 13, 2008. Prior to June 16, the state regulatory approval process had been proceeding at a measured pace since March 20, 2008, with the latest approval occurring on June 5, 2008. Considered in context, what these alleged disclosures revealed is that three state regulatory boards or commissions, less than three weeks following a four month extension of the LBO's closing deadline, failed to address the LBO as previously planned. On their face, these disclosures do not suggest Penn, since March 20, 2008 or anytime thereafter during the class period, had been perpetrating a fraud on the market by failing to disclose in numerous press releases its knowledge about the status of the LBO. The three disclosures themselves did nothing to discount the possibility that state regulators would approve the LBO before the extended closing deadline or that the LBO would ultimately be consummated.

Plaintiffs argue these disclosures revealed much more than delays in the state regulatory approval process. The TAC concluded "[a]ll these hearings were canceled because Penn National failed to provide current financial information related to the buyout," which, according to Plaintiffs, meant Penn had stopped cooperating with state regulators, which in turn showed the buyout would not close. JA at A1019 (emphasis omitted). The only fact that the TAC alleges in support of its sweeping conclusion, however, relates to the Missouri review and is based on a selective account of a June

23, 2008 report from the internet publication thedeal.com: "The Missouri review, which arbs consider the most rigorous of the approval process, is at a standstill.[7] Missouri is still waiting for updated pro forma financial data requested in April because the market has changed considerably since the parties filed for the license review last August, a source said." JA at A972. That the most discerning state in the process, Missouri, was waiting to receive revised financial data from Penn, data requested as a result of increasingly difficult market conditions, is, standing alone, hardly an endorsement of the proposition that Penn had abandoned the state regulatory process and was refusing to cooperate with regulators from states yet to approve the LBO.

But the news from Missouri did not appear in isolation. The website also reported the Illinois Gaming Board had tabled review of Penn's LBO at its May 19, 2008 meeting and requested "additional financial information on the transaction." JA at A972. The board placed the deal back on the agenda for a closed meeting to be held June 23 and 24. According to a board spokesperson quoted in the report: "*The license review would not be up for final consideration unless the information the board sought had been provided . . . .*" JA at A972 (emphasis added). The Illinois Gaming Board approved the Penn buyout on June 24, 2008. The June 23

---

[7]"Arbs" refers to arbitrageurs or those who engage in arbitrage. In the context of a takeover or buyout, "risk arbitrage" generally —

> [I]nvolves the simultaneous purchase of shares in one company and the short sale of assets in another. . . . By purchasing shares in the company that is expected to be taken over (with the anticipation that market value will increase) and selling short shares in the acquiring company (with the anticipation that market value will decrease), an investor hopes to gain from both sides of the trade.

http://www.investordictionary.com/definition/risk-arbitrage (visited March 3, 2011); *see also* Black's Law Dictionary, 112 (8th ed. 2004). The risk is that the buyout does not occur and what the arbitrageur anticipated does not materialize.

report from thedeal.com, considered in its entirety, simply belies Plaintiffs' conclusory allegation that Penn had ceased cooperating with state regulators at the time delays in the state regulatory approval process were announced on June 16, 17, and 25. What the report reveals is that Missouri regulators, in light of changed market conditions and consequent doubts about the Penn buyout, were proceeding cautiously in seeking to ascertain the true status of the LBO.

Undoubtedly, news of regulatory delays from Missouri, as well as from Maine and Louisiana, did not bolster the market's already shaken confidence in the likelihood of the Penn buyout closing. Given the downturn in the gaming market, the credit crisis, the broader market's downward trend, and the consequent fact that many LBOs involving domestic targets were in trouble, the postponements did nothing to reassure the market that Penn's LBO would close. But to conclude these disclosures revealed facts that were related in any manner to the fraudulent nature of Penn's prior press releases proves too much. The disclosures did not "relate back" to Penn's earlier omissions of the alleged truth because they did not even inferentially suggest that Penn's prior press releases were fraudulent and that the LOB would not close. *In re Williams Sec. Litig.*, 558 F.3d at 1140. Upon the facts pled, the TAC's conclusion — that the disclosures of June 16, 17, and 25, 2008, informing the market of delays in the regulatory approval process revealed something about the fraudulent nature of Penn's prior press releases and the undisclosed knowledge behind them — is unsustainable.

## B.

The term unsustainable similarly characterizes the TAC's conclusion that the information contained in the June 24, 2008 analyst reports from Susquehanna and Oppenheimer constituted corrective disclosures of Penn's alleged fraud. The TAC simply alleges "Oppenheimer Analysts issued a research report stating 'the markets have become increasingly con-

vinced that the company's acquisition will not be completed.'" JA at A1021. That statement certainly does not imply that Penn had issued fraudulent press releases during the class period by failing to disclose what it supposedly knew about the LBO. And if that were not enough, news that the market had become convinced the LBO would not close as written was hardly novel. With the initial closing date having passed and the revised date looming, that Penn's stock was trading well below the buyout price of $67 per share said quite enough about the investment risk.[8] Moreover, the market had been questioning the viability of the LBO since at least the start of February 2008, when the price of Penn shares began to steadily decline, reaching a low prior to commencement of the class period of $38.76 on March 10, a 42% discount off the $67 buyout price. Penn's stock had been trading in a similar range just prior to issuance of Oppenheimer's report.

Meanwhile, the Susquehanna report, like the Lehman Brothers report three month prior, declined to predict the LBO's outcome given the continuing absence of facts directly related to the deal's prospects:

> We are suspending our investment rating on PENN. Shares have been highly volatile in recent months *on unsubstantiated speculation* as to whether or not the pending buyout deal will go through. Fundamentals are clearly playing no role in the trading of the stock,

---

[8]When an LBO is announced, the stock of the target usually trades at a discount to the buyout price prior to the LBO's closing. The size of the discount, also known as the deal spread, generally depends on the period of time to closing and the perceived risk that the deal will not close. *See* Isaac Corre, *Corporate Control Transactions: Commentary on Fischel*, 69 U. Chi. L. Rev. 963, 970 (2002). In other words, the deal spread represents "the market's assessment of likelihood that the [buyout] would close; . . . the higher the spread the lower the probability that the deal would close." Dale A. Oesterle, *Regulating Hedge Funds*, 1 Entrepren. Bus. L.J. 1, 20 (2006).

and day-to-day handicapping of the deal's prospects
has become the primary mover of the stock. At this
point, there is *significant uncertainty* as to whether
the company will be acquired by the Fortress Invest-
ment Group LLC and Centerbridge Partners, L.P. for
$67 per share. . . . [W]e do not expect more public
announcements from the company any time soon.
Thus, we are suspending our rating until we have
more clarity on the prospects of the deal closing.

JA at A982 (emphasis added). Notably, Susquehanna consid-
ered numerous possible reasons for the most recent downturn
in Penn's stock price, none of which even remotely hinted at
fraud: "The stock has continued to trade down since last week
when news of the Hexicon deal to buy Huntsman being on the
brink of collapsing was announced. There have been no
updates from either Penn or the buyers, and *any opinion about
whether or not the deal will close or not close is pure specula-
tion*, in our view." JA at A982 (emphasis added). Susque-
hanna observed that in addition to the shock waves from the
troubled Hexicon deal, "the current state of the economy" had
"obviously impacted" Penn's stock price. JA at A982. Sus-
quehanna also reported the unfavorable effect that recent
smoking bans might have on Penn's Illinois and Colorado
properties, and the effect that a Maryland proposal to legalize
slot machines might have on Penn's West Virginia properties.
Conspicuously absent from Susquehanna's report is any sug-
gestion that Penn, at any point during the previous three
months, had issued misleading press releases as a conse-
quence of its refusal to disclose the true facts about the LBO's
prospects. *See Lentell*, 396 F.3d at 175 n.4 (analyst down-
grades did not constitute corrective disclosures because they
did not reveal that analysts' prior representations were false).
What the report revealed was risk as evidenced by its conclu-
sion: "There is a risk that the deal falls apart and the stock
returns to pre-deal levels." JA at A982. The "unsubstantiated
speculation" and "significant uncertainty" surrounding the
LBO's prospects did not in any sense reveal to the market the

alleged fraudulent nature of Penn's practices over the course of the class period. *See Metzler Inv. GMBH*, 540 F.3d at 1063.

## C.

Lastly, the TAC alleges Penn's failure to issue a press release announcing the Illinois Gaming Board's approval of the LBO on June 24, 2008, disclosed to the market that Penn had misled the market into believing the LBO would close. This, according to the TAC, is because Penn issued press releases announcing all prior state regulatory approvals of the LBO. Plaintiffs essentially ask us to conclude that Penn's non-announcement of positive news — Illinois' approval of the LBO — constitutes a corrective disclosure. Plaintiffs have not pointed us to any decision that suggests a defendant's silence may constitute a corrective disclosure.[9] *Cf. In re Williams Sec. Litig.*, 558 F.3d at 1138 ("[I]t would be difficult to characterize an announcement that contained no negative information . . . as revelatory of the truth."). Moreover, we are uncertain how Penn's failure to issue a press release on June 24 suggests the falsity of press releases issued prior to and including June 6. We acknowledge Penn's silence likely further fueled speculation that the LBO's death knell would soon sound. But we are at a quandary to understand how speculation about the LBO's prospects based on Penn's failure to issue a press release on June 24 announcing the Illinois Gaming Board's approval of the buyout translates into knowledge

---

[9]Nor does every announcement of bad news constitute a corrective disclosure. In a financial market wrought with turmoil across the spectrum, "[t]he standard cannot be so lax that every announcement of negative news becomes a potential 'corrective' disclosure." *In re Williams Sec. Litig.*, 558 F.3d at 1140 (internal quotation marks omitted). Otherwise, contrary to the aim of § 10(b), unwarranted federal security fraud claims seeking "broad insurance against market losses" might run amok. *Dura Pharm., Inc.*, 544 U.S. at 345 (explaining that § 10(b) provides a cause of action "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").

of the relevant truth, namely that from March 20, 2008 through June 6, 2008, Penn issued a series of fraudulent press releases because Penn *knew then* the deal was off.

## IV.

Plaintiffs argue that to sufficiently plead the first component of loss causation, *i.e.*, exposure of the relevant truth, the six partially corrective disclosures identified in the TAC, considered holistically, "need[ ] only to alert investors to the fact the merger was off the table." Reply Brief at 4 (emphasis omitted). To that our response is two-fold. First, while we suppose such a factual disclosure about the LBO may reveal a part of the relevant truth because the falsity of the eight press releases necessarily depends on the fact Penn knew the deal was off, the disclosures identified in the TAC, as we have just seen, did not disclose to the market any such *fact*. Of course, one might posit that following the disclosures' dissemination "the market *must* have known" the deal was off. *In re Williams Sec. Litig.*, 558 F.3d at 1138. Such sentiment seems particularly apropos in hindsight given the downward trend in Penn's stock price over the course of the disclosures and Penn public announcement of the LBO's termination very shortly thereafter. But —

> So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market "understood" a . . . statement precipitating a loss as a coded message revealing fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what *Dura* discredited—that loss causation is established through an allegation that a stock was purchased at an inflated price. Loss causation requires more.

*Metzler Inv. GMBH*, 540 F.3d at 1064 (internal citation omitted). Sentiment simply is not enough to sufficiently plead loss causation. Speculation and conjecture, even a well-educated

guess, in the context of market prognostication does not suffice to establish a fact. *Cf. id.* at 1065 ("The TAC's allegation that the market understood the . . . disclosures as a revelation of . . . systematic manipulation . . . is not a 'fact.'").

To be sure, the six purported corrective disclosures identified in the TAC alerted investors to the ever-mounting risk that the deal was unlikely to close. But this case is not about materialization of a concealed risk. Plaintiffs do not argue that "negative investor inferences" drawn from the disclosures "were a foreseeable materialization of the risk concealed" by Penn's fraudulent press releases.[10] *In re Omnicom Group Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). The market well understood the risk. The alleged disclosures told the market nothing factually about the deal's prospects that it had not already heard, repeatedly. We have already discussed the price trend of Penn's shares over the course of 2008 and the Lehman Brothers report from April 1, 2008, in which Lehman's declined to predict whether the LBO would close. Based upon activity in the options market, Lehman Brothers at that time estimated at best a 32% probability the deal would close as written. *See* JA at A455. Two weeks later, on April 16, thedeal.com reported the Penn deal was "trading so badly [around $40 per share] that it could become a foregone conclusion that the buyers seek a price cut or want out of the buyout." JA at A444. The report noted the fact "[t]hat Deutsche Bank and Wachovia are leading the Penn financing does not boost confidence as the buyout comes closer to its funding dates." JA at A444. Similar to Susquehanna's June 24 report, thedeal.com's April 16 report attributed the downward drift in Penn's stock price in 2008 to the state of economic affairs.

---

[10]"In such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of the fraud that caused plaintiffs' loss." *Teachers' Ret. Sys.*, 477 F.3d at 187; *see also In re Williams Sec. Litig.*, 558 F.3d at 1138 (recognizing the truth may be revealed by the materialization of the concealed risk rather than by a public disclosure of the relevant truth).

Second, even assuming the six disclosures revealed that Penn knew the LBO would not close, the fact of such knowledge alone would still not suffice. To sufficiently plead loss causation, the TAC must have alleged facts suggesting something more. Specifically, the TAC must have alleged facts to show the disclosures revealed to the market something about the fraudulent nature of the press releases on which Plaintiffs purportedly relied to their detriment because only then could the press releases have caused Plaintiffs' economic loss. *See Metzler Inv. GMBH*, 540 F.3d at 1063. The fact that Penn knew sometime prior to June 16, 2008 that the deal would not close says nothing about its knowledge on or prior to June 6, 2008 when it issued the last of its eight press releases related to the state regulatory process. None of the TAC's six alleged corrective disclosures "even purport[ ] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d at 511. The TAC fails to adequately plead loss causation because it does not allege facts that suggest Penn's fraudulent omissions over the course of eight press releases ever "'became generally known.'" *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (rejecting the argument that "the precise fraud that resulted in the underlying transaction [need not] be the subject of a later corrective disclosure in order to satisfy loss causation").

Because the series of six partially "corrective" disclosures alleged in the TAC did not, gradually or otherwise, reveal to the market any undisclosed truth about Penn's undisclosed knowledge and resulting fraudulent omissions, any subsequent decline in Penn's share price cannot be attributed to those omissions. Accordingly, the judgment of the district court is

*AFFIRMED.*[11]

---

[11]Because the TAC fails to state a § 10(b) claim, we necessarily uphold the district court's dismissal of Plaintiffs' § 20(a) claim against Penn Offi-

WYNN, Circuit Judge, concurring in the judgment:

I concur in the majority's judgment but write separately because I read Plaintiffs' complaint more broadly than the majority. While it is true that Plaintiffs make a securities fraud allegation based, at least in part, on press releases that Penn issued between March 20 and June 6, 2008, I believe that Plaintiffs claim more generally that Penn wrongly failed to disclose that the leveraged buyout would likely not close.

Nonetheless, even under my broader reading of the complaint, I agree with the majority's judgment that Plaintiffs' Third Amended Complaint founders. That is because the alleged corrective disclosures tell nothing of the alleged fraud, and, even assuming for the sake of argument that the alleged disclosures did reveal that the leveraged buyout would likely not close, the market had already come to that conclusion.

## I.

As the majority notes, the Third Amended Complaint alleges that Penn issued seven press releases between March 20 and June 5, 2008, notifying the public of state regulatory approvals. Further, on June 6, 2008, Penn issued an eighth press release announcing the extension of the leveraged buyout closing date by 120 days, from June 15 to October 13, 2008. The June 6 press release stated that the extension was necessary to secure regulatory approvals from Illinois, Indiana, Louisiana, Maine, and Missouri. Plaintiffs allege that while Penn behaved publicly, through these releases, as if the leveraged buyout would close, Penn was involved in private discussions with the buyers and financing institutions about the renegotiation or termination of the buyout.

---

cers Peter M. Carlino and William J. Clifford based upon such claim's failure to allege a predicate violation of § 10(b). *See* 15 U.S.C. § 78t(a) (imposing liability on persons who "control[ ] any person liable under any provision of this chapter").

The Third Amended Complaint also alleges more broadly that Penn failed to disclose that the buyout might not close. For example, in paragraph 34 Plaintiffs contend that "[d]uring the period from March 20, 2008 through June 15, 2008 inclusive, Defendants never informed or apprised the investing public of such material developments (ongoing termination and/or renegotiation discussions)." After explaining that the decision to terminate the buyout had likely occurred by May 2008, Plaintiffs allege, in paragraph 55, that "Defendants did not previously disclose the potential merger termination to the investing public or, in any way, indicate to the investing public that the Purchaser and/or banks were seeking to materially renegotiate the buyout price and/or terminate the previously announced, published and stockholder-approved cash buyout/merger agreement."

Additionally, in paragraph 57, Plaintiffs allege that "after months of undisclosed negotiations between the Defendants, Purchaser, the financing banks, as well as with each party's respective advisors and counsel, the parties waited until July 3, 2008 to finalize the Termination and Settlement Agreement . . . ." Plaintiffs contend in paragraph 61 that "Defendants deliberately elected not to disclose or apprise the investing public that the original buyout/merger agreement was ever in jeopardy or that termination or modification negotiations were taking place in order to keep Penn share prices artificially inflated." Per paragraph 62, Penn's "affirmative misrepresentations, along with the concealments of the ongoing negotiations and discussions . . . influenced Plaintiffs and the Class to retain and/or purchase additional Penn shares." Accordingly, per paragraph 65, "[b]y concealing material information concerning the termination negotiations, Defendants were artificially manipulating the open market price and obstructing the operation of the market as indices of the stock's true value . . . ."

Because of these and other allegations in the Third Amended Complaint, I believe that Plaintiffs claim more gen-

erally that Penn wrongly failed to disclose that the leveraged buyout would likely not close. I therefore diverge from the majority's suggestion that the alleged securities fraud is tied exclusively to the press releases that Penn issued between March 20 and June 6, 2008.

## II.

I agree with the majority that affirmative (mis)statements or half-truths can serve as the basis for 10b-5 liability. But so can omissions—that is, the failure to disclose material facts that the plaintiffs "ha[ve] the right to know." *See, e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151-153 (1972) ("It is no answer to urge that, as to some of the petitioners, these defendants may have made no positive representation or recommendation. The defendants may not stand mute" when in possession of material information that those buying and selling securities have a right to know.); *Cox v. Collins*, 7 F.3d 394, 396 (4th Cir. 1993) (noting that plaintiffs alleged securities fraud by positive misrepresentation and by nondisclosure of material information and affirming denial of judgment as a matter of law in the face of conflicting evidence regarding the "materiality of the alleged omissions and [defendant's] alleged knowledge and intent to deceive").

Nevertheless, even read more broadly to encompass Penn's general failure to disclose that the buyout would likely be terminated, the Third Amended Complaint still fails to successfully plead loss causation. To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation (that is, the economic loss must be proximately caused by the misrepresentation or omission)." *Matrix Capital Mgmt. Fund, LP v.*

*BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (internal quotation marks and emphasis omitted).

Regarding the last two elements, the Supreme Court, in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), recently made clear that securities fraud suits are permitted "where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 346. In other words, the alleged facts must show that the misrepresentation or omission was "one substantial cause of the investment's decline in value." *In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009) (internal quotation marks omitted). Only then may we conclude that the complaint alleges the necessary causal link between the defendant's alleged fraud and the plaintiff's economic harm. *See Dura Pharm.*, 544 U.S. at 346-47. Therefore, as the majority notes, because the Third Amended Complaint relies upon the cumulative effect of a series of partially corrective disclosures to plead loss causation, it must state facts showing that those disclosures gradually revealed to the market the undisclosed truth about Penn's fraud and resulted in a decline of Penn's share price.

Plaintiffs allege that the following purported corrective disclosures leaked the truth onto the market: (1) Maine, Louisiana, and Missouri regulators failed to take action regarding the transaction in June 2008; (2) Illinois regulators approved the transaction in June 2008 but Penn failed to announce that approval in a press release; and (3) One brokerage firm suspended coverage of Penn's stock in June 2008, while another made negative comments regarding the likelihood of the merger's consummation. None of these events revealed in any way that Penn and other parties to the buyout were discussing terminating or restructuring the transaction.

The one regulatory approval and three regulatory board failures to act disclosed nothing other than that which Penn had already made clear, in the leveraged buyout agreement filed with the Securities and Exchange Commission and in

Penn's June 6, 2008 press release: Penn sought regulatory approval for the buyout, and the regulatory approval process would not be completed by June 15, 2008. These regulatory events, therefore, did not reveal Penn's alleged fraud.

Further, one stock brokerage's suspension of coverage and another's negative comments did not constitute corrective disclosures. On June 24, 2008, Susquehanna Financial Group, LLP announced that it was suspending its coverage of Penn's stock. In doing so, Susquehanna expressly noted that "any opinion about whether or not the deal will close or not close is pure speculation, in our view." Susquehanna's announcement cannot, particularly in the face of that caveat, constitute a corrective disclosure that Penn and other parties to the buyout were discussing terminating or restructuring the transaction.

Oppenheimer Analysts issued a report indicating that "the markets have become increasingly convinced that the company's merger will not be completed." But that June 24, 2008 statement did not say anything other than that which Lehman Brothers had indicated in its April 1, 2008 report attached to Plaintiffs' Third Amended Complaint—that the deal was unlikely to be consummated, especially given general economic deterioration, credit market deterioration, and then-recent headlines about other distressed and cancelled leveraged buyouts. Lehman Brothers' April 1, 2008 report estimated the likelihood of the deal's closing to be between 21 and 32 percent. Not surprisingly, therefore, Penn's share price steadily declined from the time the buyout was announced to May 2008, the time of the alleged decision to renegotiate or terminate the deal.

In any event, neither the Oppenheimer report nor the Susquehanna announcement disclosed to investors that the parties were terminating or renegotiating the deal. Moreover, the Lehman Brothers report from April 1, 2008, among other

things, indicates that the market had decided well before May 2008 that Penn's buyout would likely fall through.

Under these circumstances, the alleged corrective disclosures failed to disclose Penn's alleged fraud, and, even assuming for the sake of argument that the alleged disclosures did reveal that the leveraged buyout would likely not close, the market had already come to that conclusion. With their Third Amended Complaint, Plaintiffs therefore still fail to successfully plead loss causation. For this reason, I concur in the majority's judgment.